IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JULIE MAHONY,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>UNIVERSAL PEDIATRIC SERVICES, INC.;<br>ULTIMATE NURSING SERVICES OF<br>IOWA, INC.; S. TUCKER ANDERSON; and<br>CONNIE FREEMAN,<br><br>　　　　Defendants. | No. 4:08-cv-00343–JEG<br><br>**O R D E R** |

Before the Court is Defendants' Motion for Summary Judgment in the above-captioned action. Plaintiff resists the motion. Also before the Court is Plaintiff's Motion to Strike. Defendant resists the motion. The matter came on for hearing on November 20, 2009. Paige Fiedler represented Plaintiff Julie Mahony (Mahony); Michael Reck and Kelsey Knowles represented Defendants Universal Pediatric Services, Inc. (UPSI), and Ultimate Nursing Services of Iowa, Inc. (UNSI)[1], Tucker Anderson (Anderson), and Connie Freeman (Freeman) (collectively, UPSI or Defendants). These matters are fully submitted and ready for disposition.

## I.　SUMMARY OF MATERIAL FACTS[2]

Mahony was hired by UPSI as its vice president of nursing to assume responsibility for regulatory and licensing compliance. UPSI provided its employees with an employee handbook that outlined UPSI's policies and procedures. One of Mahony's responsibilities was making sure that UPSI was Medicare certified in order to be reimbursed by Medicaid for home health care services.

---

[1] The record makes no distinction between UPSI and UNSI. The Court, therefore, makes no distinction for purposes of this motion.

[2] Facts recited herein are either not in dispute or are taken in the light most favorable to the nonmovant. See Eastling v. BP Prods. N. Am., Inc., 578 F.3d 831, 836 (8th Cir. 2009).

In 2008, UPSI decided to open an office in Sheldon, Iowa, with the intention of opening by June 1, 2008.  New home health care offices need to be Medicare certified by filling out Form CMS-855A in order to be reimbursed by Medicaid.  Branch offices may register with Medicare by submitting a completed questionnaire.

At a meeting on Thursday, June 5, 2008, Mahony told Anderson, who is president and CEO of UPSI, "[w]e cannot do this," referring to opening the Sheldon office, because a CMS-855A had not yet been completed.  Defs.' App. 13.  During the meeting, Anderson insisted that Mahony was responsible for regulatory compliance and blamed Mahony for not completing the necessary forms.  Both Mahony and Anderson became upset at this meeting.  After the meeting, Mahony left work and did not return to her office until Monday, June, 9, 2008.

At about 8:20 a.m. on June 9, 2008, Mahony filed a grievance with UPSI's Human Resources Manager Ashley Wirtjes (Wirtjes) against UPSI for opening the Sheldon office.  Mahony also included allegations of harassment and discrimination in her grievance.  Anderson went to Mahony's office at about 9:45 a.m, complaining about Mahony's insistence that the opening of the Sheldon office be delayed and calling into question her continued employment with UPSI.

UPSI hired attorney Deb Tharnish to assist in the grievance investigation.  UPSI issued a written decision regarding Mahony's grievance on June 10, 2008.  UPSI concluded that the Sheldon office would not be opened until certification was in place and that, although the June 5 meeting was tense, there was no discrimination or harassment.  The decision also included the statement, "As discussed during the investigation process and as part of company policy, retaliation will not be accepted."  Defs.' App. 45.  On June 13, 2008, attorney Gordon Fischer sent Mahony a letter that terminated her employment with UPSI.

On August 18, 2008, Mahony commenced this lawsuit in the Iowa District Court for Polk County, claiming that her termination violated public policy, constituted retaliation under the

Federal False Claims Act (FCA), and was unlawful under principles of promissory estoppel. Defendants timely removed the case to this Court.  Defendants filed a motion for summary judgment on all counts on July 15, 2009.  Mahony filed a motion to strike on August 25, 2009, arguing that portions of Defendants' summary judgment appendix should be stricken because Defendants violated discovery procedures.  After extension of time and completion of pleadings and briefing on the pending motions, the matters were fully submitted by September 21, 2009.

## II.    DISCUSSION

### A.  Motion to Strike[3]

Mahony moves to strike three pages of employee relations files from UPSI's supplemental summary judgment appendix, specifically pages four to six containing Wirtjes' notes.  Mahony asserts that UPSI produced these documents after the discovery deadline and failed to identify the documents when they were produced.  Mahony also argues that the documents are not admissible under Federal Rule of Evidence 803(6).  UPSI responds that no basis exists to strike the documents, the documents have in fact been produced in the manner Mahony requested, and the alleged irrelevance of the documents does not support a motion to strike.

The Court entered a scheduling order and discovery plan on October 6, 2008, setting a discovery deadline of June 1, 2009.  The Court specifically ordered that "[d]iscovery shall be concluded, *and not propounded*, by June 1, 2009."  Sched. Order & Disc. Plan ¶ 6 (emphasis added).  On May 26, 2009, Mahony served a written discovery request on UPSI, under the mistaken impression that the discovery deadline was July 1, 2009.  Mahony, realizing her mistake, moved for an extension of the discovery deadline, which this Court granted in part.

---

[3] Mahony cites no authority supporting a motion to strike appendix material in support of a motion for summary judgment.  Such material would not be a pleading.  See Fed. R. Civ. P. 12(f).

Mahony was allowed to take four depositions by July 15, 2009, and UPSI was ordered to respond to Mahony's May 26 written discovery.

Mahony deposed Wirtjes on July 8, 2009. UPSI produced the documents in question on July 20, 2009, as a supplement to its initial June 29, 2009, response to the May 26 written discovery. UPSI referenced Wirtjes notes in its reply to Plaintiff's resistance to summary judgment for the purpose of disputing the facts set forth by Mahony in her resistance to summary judgment brief.

The Court's June 18, 2009, order granting Mahony's request to extend the discovery deadline did not impose a deadline upon UPSI to respond to Mahony's May 26 written discovery. The July 15, 2009, deadline applied only to depositions; thus, Mahony's assertion that Wirtjes' notes should be stricken because UPSI produced the notes after the July 15 deadline is without basis. Furthermore, the Court does not consider the thirty-two day interval between an order to respond to written discovery and production of documents worthy of sanction under these circumstances.

Additionally, the remedy that Mahony seeks for this discovery dispute is inappropriate. Local Rule 37(a) requires that motions relating to discovery include a declaration (1) that counsel has personally conferred with the opposing party in an attempt to resolve the issues; (2) that the lawyers are unable to agree; and (3) as to the nature of the discovery. Mahony has not filed the required declaration, and the Court is unable to determine the extent to which the parties have attempted to resolve this issue without the Court's intervention. Local Rule 37 reflects this Court's policy to become involved in discovery disputes only as a last resort. This motion to strike would effectively circumvent that policy.

Federal Rule of Civil Procedure 37(b) provides for specific sanctions when a party fails to comply with a discovery order. When a party fails to disclose information in response to written discovery, Rule 37(c) provides for substantially all of the same sanctions allowed by Rule 37(b).

A party must disobey a discovery order before sanctions may be imposed, which UPSI has not done. However, even if UPSI had disobeyed the scheduling order, Mahony seeks to strike documents from an appendix, a remedy not provided for in the rules.[4] While the list of remedies provided by Rule 37 is not exhaustive, the Court is guided by principles of justice. Fed. R. Civ. P. 37(b)(2)(A) ("If a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders.") No injustice has occurred in this case. Mahony's error regarding the original June 1, 2009, deadline created the situation that compressed discovery, and UPSI has produced the requested documents. Mahony implies that UPSI strategically withheld Wirtjes' notes until after Wirtjes was deposed. Following this rationale, Mahony asks the Court to first read into this Court's order granting Mahony an extension of time a deadline that was not imposed, and then to attribute improper conduct to UPSI for failure to comply with that fictional deadline. This the Court cannot do.

## B. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." Miner v. Local 373, 513 F.3d 854, 860 (8th Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). On a motion for summary judgment, the Court views the evidence

---

[4] Rule 37(b)(2)(A)(iii) provides that a court may "strik[e] pleadings in whole or in part." This sanction most nearly provides the remedy Mahony seeks; however, it only allows the Court to strike pleadings. Rule 37(b)(2)(A)(ii) allows a court to "prohibit[] a disobedient party from . . . introducing designated matters in evidence." However, on a motion for summary judgment, any question of admissibility will only affect the weight this Court will accord the discovery material. Cf. Maytag Corp. v. Electrolux Home Prods., Inc., 448 F. Supp. 2d 1034 (N.D. Iowa 2006) (finding it unnecessary to strike challenged affidavit when court can simply disregard inadmissible portions).

and inferences in the light most favorable to the nonmovant.  Id.  The nonmovant "must set forth specific facts sufficient to raise a genuine issue for trial" and "may not rest upon mere denials or allegations in the pleadings."  Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248; Wells Fargo Fin. Leasing, Inc. v. LMT Fette, Inc., 382 F.3d 852, 856 (8th Cir. 2004).  As Mahony argues, it is common to recognize, albeit in the context of discrimination cases, that because employment actions are uniquely fact based, summary judgment should seldom be granted.  See, e.g., Bassett v. City of Minneapolis, 211 F.3d 1097, 1099 (8th Cir. 2000).  However, there is no employment litigation exception to the application of Rule 56 where there is no genuine issue of material fact, and judgment may be rendered as a matter of law.  See Berg v. Norand Corp., 169 F.3d 1140, 1144 (8th Cir. 1999); Reich v. Hoy Shoe Co., Inc., 32 F.3d 361, 365 (8th Cir. 1994).  "The moving party is entitled to summary judgment 'if the nonmoving party has failed to make a sufficient showing on an essential element of her [or his] case with respect to which she [or he] has the burden of proof.'"  Schuhardt v. Wash. Univ., 390 F.3d 563, 566 (8th Cir. 2004) (quoting Hammond v. Northland Counseling Ctr., Inc., 218 F.3d 886, 891 (8th Cir. 2000)).

### C. False Claims Act

In count two of her complaint, Mahony alleges that UPSI violated the FCA whistleblower statute when it fired her.  UPSI counters that the FCA does not apply because UPSI never made any false representations.  UPSI also argues, and Mahony concedes, that FCA actions will not lie against individual defendants.  An FCA retaliation claim "can only be against an employer." U.S. ex rel. Golden v. Ark. Game & Fish Comm'n, 333 F.3d 867, 870 (8th Cir. 2003) (quotation omitted); 31 U.S.C. § 3730(h).  Therefore, as an initial matter Defendants Tucker and Freeman are entitled to summary judgment on the FCA retaliation claim as a matter of law.

The FCA whistleblower statute entitles an employee to all relief necessary to make that employee whole if she is

> discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of [the FCA].

31 U.S.C. § 3730(h)(1).  In order to establish an FCA whistleblower retaliation claim, a plaintiff must prove that "(1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity."  Schuhardt, 390 F.3d at 566.

## 1. Protected Conduct Under the FCA

Mahony argues that she engaged in conduct protected by the FCA when she demanded that operations out of the Sheldon office immediately cease because she would not acquiesce to Medicaid fraud and that she filed a grievance in accordance with her demand.  UPSI argues that Mahony's claim fails because Mahony did not believe that a false claim had actually been submitted.

Protected activity is established when the employee's actions satisfy the following conditions: "(1) the employee's conduct must have been in furtherance of an FCA action;" and "(2) the employee's conduct must be aimed at matters which are calculated, or reasonably could lead to a viable FCA action."  Id. at 567.  The second condition is satisfied if the employee in good faith believes and a reasonable employee in the same or similar circumstances as the plaintiff might believe that the employer is possibly committing fraud against the government. Id. (citing Wilkins v. St. Louis Housing Auth., 314 F.3d 927, 933 (8th Cir. 2002)).  This reasonableness test does not require that the Plaintiff actually file an FCA action; rather, the

Plaintiff need only complain of activities to alert the employer to fraud or illegal activity.  See Green v. City of St. Louis, Mo., 507 F.3d 662, 667 (8th Cir. 2007); Schuhardt, 390 F.3d at 567.

Both parties' arguments focus on the second condition; however, the facts do not present clear evidence that Mahony satisfied the first element by showing that she acted in furtherance of an FCA action.  Schuhardt, a case in which the Eighth Circuit reversed a grant of summary judgment in an FCA retaliation claim, provides guidance regarding the "in furtherance of" condition of an FCA action.  Schuhardt, 390 F.3d at 569.  The court in Schuhardt found the following salient facts sufficient to conclude that the plaintiff's actions were in furtherance of a *qui tam*[5] action:

> [The employee] perceived a mass effort to modify patient records months after a procedure had occurred.  She explained that doctors signed reports without reviewing files.  She advised her supervisor that the activity may be fraudulent and illegal.  She also mentioned to the supervisor that a government agency would forbid the practice if it was aware of it.  [The employee] complained to the [employer] over its confidential hotline.  Then, when the billing practice remained unchanged, she copied files that she believed to be evidence of fraud.

Id. at 567.  The court found it significant that the district court ignored the fact that the employee had copied files and took them home to substantiate the existence of fraud.  The record does not reveal any similar action taken by Mahony.

Other circuits have dealt with the "in furtherance of" condition.  In McKenzie v. BellSouth Telecommunications Inc., 219 F.3d 508 (6th Cir. 2000), the court held that when an employee

---

[5] A retaliation claim is maintained for the benefit of the employee; however, it is based upon, at minimum, possible fraudulent conduct against the United States government.  See 31 U.S.C. §§ 3729, 3730(b), (h)(1).  FCA actions may be maintained by either the government or a person who knows of false or fraudulent claims made to the United States government – the latter termed a *qui tam* action.  31 U.S.C. § 3729.  Thus, relevant to retaliation claims, the actions taken by a plaintiff must be actions that could form the basis of a *qui tam* action such as gathering evidence or alerting the government of possible fraud, even if the plaintiff is unaware of the FCA or *qui tam* actions at the time he does so.  United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 741 (D.C. Cir. 1998); United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir. 1996).

makes numerous reports of wrongdoing to supervisors, he is not acting in furtherance of a *qui tam* action, and repeated refusals to falsify records is not sufficiently connected to exposing fraud against the federal government to support a *qui tam* action.  In <u>Eberhardt v. Integrated Design & Construction, Inc.</u>, 167 F.3d 861 (4th Cir. 1999), the court held that an employee may establish the first element of an FCA retaliation claim when he writes a memo to his employer alleging violations of the FCA, advises his employer of his intentions to file a *qui tam* action, and goes to the FBI to advise it of evidence relevant to an FCA claim stored by the employer.  In <u>United States ex rel Yesudian v. Howard University</u>, 153 F.3d 731 (D.C. Cir. 1998), the court held that an employee presented evidence sufficient to gain the protection of the FCA whistleblower statute when he had gathered evidence, including photographs, that showed that another employee had committed fraud and the first employee knew that the university received over 80 percent of its funding from the federal government.  In <u>United States ex rel. Ramseyer v. Century Healthcare Corp.</u>, 90 F.3d 1514 (10th Cir. 1996), the court held that when an employee only advises her superiors that the employer is not complying with Medicaid requirements, the employee cannot state a claim for retaliatory discharge under the FCA.  The facts in this case align better with the cases where no FCA retaliation action could be maintained because Mahony only advised her boss that UPSI could not open the Sheldon office, and an internal grievance cannot serve as the basis of for an FCA lawsuit.[6]

Mahony argues that she had a good faith and objectively reasonable belief that UPSI was "*possibly* committing fraud against the government."  Pl.'s Br. 32 (emphasis in original).  UPSI argues that the Court need not even reach the question of reasonableness because there is no evidence to support a good faith belief that UPSI was committing fraud.  Before even addressing that law relating to their arguments, Mahony's argument reveals a possible timing problem.  All

---

[6] The internal grievance can, however, serve as a basis for protection under the FCA whistleblower statute.  <u>Schuhardt</u>, 390 F.3d at 567.

of the law cited by the parties indicates that the employee must at least believe that the employer is *committing* fraud in the present tense or had *committed* fraud in the past tense. Mahony points to no law that would allow an FCA claim when an employee believes that the employee *will* or *intends to* or *may* submit a false claim to the government in the future. Mahony puts forth as facts her knowledge of UPSI's intent to submit a false claim. She also asserts as fact her knowledge of Anderson's and Freeman's history of fraudulent claims, yet such assertions are unsubstantiated in the record apart from Mahony's own testimony. Mere allegations, without more, are insufficient to satisfy the showing required to resist a motion for summary judgment. Reed v. City of St. Charles, Mo., 561 F.3d 788, 791 (8th Cir. 2009).

UPSI argues that Green v. City of St. Louis, Mo., 507 F.3d 662 (8th Cir. 2007), controls the question of whether Mahony engaged in protected conduct while Mahony avers that Green is factually distinguishable. The Court finds Green to be on point. In Green, the employee brought an FCA retaliation claim, alleging that his employer had transferred his job duties and failed to rehire him because he alerted his employer to possible fraud. Id. at 668. The employee produced memoranda to substantiate his claim yet none that "described any actual fraudulent claim being presented to the government." Id. At his deposition, the employee stated that he did not know of any fraudulent information being submitted to the government, although he thought the employer's method of complying with government regulations was flawed. Id. In affirming the district court's grant of summary judgment for the employer, the Eighth Circuit noted,

> [The employee] was unable to point to any case in which he even suspected that the [employer's] practice had led to a false statement. If [the employee] had no reason to believe there was a false or fraudulent claim, he is not protected from retaliation under the False Claims Act.

Id. In this case, Mahony has only pointed to UPSI opening the Sheldon office as a basis for her possible FCA action. Like the employee in Green, Mahony has not pointed to any instance in

which UPSI's practices had led to false statements to the federal government.[7]  To show that her suspicions were reasonable, Mahony makes several unsubstantiated statements indicating that Freeman bragged about violating Medicare regulations in another business, that UPSI had formerly made false statements during state surveys and encouraged Mahony to do so also, and that Freeman and Anderson bragged about committing tax fraud.  Again, there are no affidavits or other material in the record that support these claims other than Mahony's own deposition. Mahony argues that the fact that the Sheldon office was operational indicated that UPSI would, of necessity, be required to submit a false claim.  Her reasoning is thus:  UPSI obtains 80 percent of its revenue from Medicaid, UPSI cannot receive payment from Medicaid unless it is certified,

---

[7] Mahony stated the following at her deposition:

Q.  Are you ever aware of Ultimate Nursing or Universal Pediatrics during your tenure actually submitting a false claim to anyone?
A.  No.
Q.  Did you ever threaten to report, then, any false claims that were ever made to anyone?  I guess the point is, if you weren't aware of any, could you have threatened to report any?
A.  No.
. . .
Q.  Did you ever report any improper conduct at UPSI or UNSI to Medicare or Medicaid?
A.  Improper conduct, I'm not sure what you mean.
Q.  Improper billing.
A.  Did I ever report any?
Q.  Yes.
A.  No.
Q.  And had you been aware of any, you certainly would have taken care of that; correct?
A.  Correct.
Q.  Did you ever report any improper conduct by UPSI or UNSI to any governmental authority?
A.  No.
Q.  Do you know of any money that Medicaid or Medicare paid to Ultimate Nursing or Universal Pediatrics that it should not have paid?
A.  I don't know of any.

Defs.' App. 15.

UPSI was operating out of the Sheldon office, and the Sheldon office was uncertified; therefore, UPSI would have to submit a claim to the government for work performed out of an uncertified office in order to get paid, and the only way to get paid would be to commit fraud.  Mahony has not pointed to any legal authority to support the proposition that speculation regarding *potential* fraud can serve as a basis for invoking the protection of the FCA whistleblower statute.  Indeed, Mahony's speculation collides with the statute's requirement that her belief must be in good faith.  See Wilkins, 314 F.3d at 933.  While good faith may indicate a subjective belief, even subjective beliefs should be supported by some verifiable statement, document, or occurrence.  See id. (finding, based on evidence in the record, that employee had both a good faith and an objectively reasonable belief that employer was committing fraud).  Other than her own assertions, the record does not reveal that Mahony had any reason to believe that a false or fraudulent claim was submitted to the government; therefore, her claim is precluded under Green.

UPSI further argues that Mahony's belief that UPSI was going to submit a false claim cannot be considered reasonable because UPSI had ninety days to register any changes with Medicare.  Medicare regulations provide that health care organizations should report changes to existing enrollment within ninety days of the effective date of the change.  42 C.F.R. § 424.520(b).  Since it appears that UPSI would indeed have had up to ninety days to report a change, Mahony's belief that UPSI was going to commit a false claim is not objectively reasonable.

UPSI asserts that Mahony's FCA retaliation claim fails because her job description included regulatory compliance.  Both parties rely on Ramseyer in support of their position.  UPSI asserts that Ramseyer stands for the proposition that an employee who advises his employer of non-compliance with Medicaid as part of his job is not protected by the FCA.  Ramseyer, 90 F.3d at 1523.  Mahony argues that, under Ramseyer, an employee whose job it is to ensure regulatory compliance is protected by the FCA if the employee does something to put the employer on notice that the employee was engaging in protected conduct.  Id. at 1522.  The

employee in <u>Ramseyer</u> had only communicated Medicaid deficiencies to her superiors, and the Tenth Circuit held that such communication was insufficient to grant her FCA protection.  <u>Id.</u> at 1523.  In this case, Mahony filed a grievance that alleged violations of state and federal law. Without deciding that the FCA grants protection to employees whose job it is to report compliance regardless of whether the employer is aware of potential protected activity, the Court finds that Mahony only communicated Medicaid deficiencies to her superiors in meetings with them and by filing an internal grievance.  Like in <u>Ramseyer</u>, such communication would not alert UPSI that Mahony was engaging in protected conduct since Mahony was merely doing her job by reporting compliance problems to her superiors and, as such, would be insufficient to grant Mahony FCA protection under <u>Ramseyer</u>.  <u>Id.</u>; <u>see also</u> <u>Schuhardt</u>, 390 F.3d at 568 n.2 ("An employee tasked with the internal investigation of fraud against the government cannot bring a § 3730(h) action for retaliation unless the employee makes it clear that her actions go beyond the assigned task.").

Because Mahony cannot show that she engaged in protected conduct, she has failed to satisfy an essential element of an FCA whistleblower retaliation claim.  Therefore, summary judgment is appropriate on Mahony's FCA claim.

### 2. Notice

Assuming, *arguendo*, Mahony had shown that she engaged in protected activity, "[a]n employee has the burden of presenting enough evidence to demonstrate that the defendant was on notice that the 'plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government.'"  <u>Schuhardt</u>, 390 F.3d at 568 (quoting <u>Ramseyer</u>, 90 F.3d at 1522).  Employees whose responsibilities include investigation of fraud against the government must meet heightened requirements to establish an FCA retaliation claim by making it clear to the employer that the employee's actions went beyond the employee's assigned tasks.  <u>Id.</u> at 568 n.2.  In <u>Schuhardt</u>, the court held that the employee's statements to her

supervisors that the employer's billing practices were fraudulent were sufficient to provide the employer with notice that the employee was engaging in protected conduct because the employee was not tasked with investigating fraud.  Id. at 568-69, 568 n.2. Therefore, summary judgment was inappropriate in Schuhardt.  Id. at 569. Schuhardt is distinguishable because, unlike the employee in Schuhardt, Mahony's job required her to ensure compliance with Medicare and Medicaid regulations so the company would not commit fraud.  Hence, Mahony is subject to heightened requirements in showing that UPSI was on notice that she was engaging in protected activity.  Even though Mahony alerted her supervisors to what she considered UPSI's regulatory non-compliance, Mahony's actions did not make it clear to UPSI that her activities went beyond her assigned task in furtherance of an FCA action.  Therefore, even finding *arguendo* that Mahony engaged in protected activity, the Court finds that Mahony has not met the heightened requirements necessary to establish the second element of an FCA whistleblower retaliation claim.

### D.  Termination in Violation of Public Policy

UPSI argues that summary judgment must be granted on count one of the complaint because no public policy exists that protects Mahony, and even if there were such a public policy, Mahony did not engage in protected conduct.  Mahony counters that a clearly defined public policy protects employees like herself from being fired for refusing to participate in illegal acts, and that genuine issues of material fact exist regarding whether she engaged in protected conduct and the reason for her firing.

Iowa adheres to the common-law employment-at-will doctrine but has recognized the public-policy exception to that doctrine.  Jasper v. H. Nizam, Inc., 764 N.W.2d 751, 761 (Iowa 2009).  Under Iowa law, the elements of a cause of action for termination in violation of public policy are

> (1) existence of a clearly defined public policy that protects employee activity;
> (2) the public policy would be jeopardized by the discharge from employment;
> (3) the employee engaged in the protected activity, and this conduct was the
> reason for the employee's discharge; and (4) there was no overriding business
> justification for the termination.

Id. (citing Lloyd v. Drake Univ., 686 N.W.2d 225, 228 (Iowa 2004)).  The cases wherein the
Iowa Supreme Court has found that termination violated public policy generally fall into one of
four categories of statutorily protected conduct: "(1) exercising a statutory right or privilege;
(2) refusing to commit an unlawful act; (3) performing a statutory obligation; and (4) reporting a
statutory violation."  Id. at 762 (citations omitted).  In Jasper, the Iowa Supreme Court held that
administrative regulations can provide a basis for the tort of termination in violation of public
policy in some cases.  Id. at 763-64.

Mahony argues that she was fired because she refused to commit an unlawful act.  Before
the Court can determine if a genuine issue of material fact exists as to why Mahony was fired,
the Court must determine, as a matter of law, whether a clearly defined public policy exists that
protects employees in circumstances like Mahony's and, if so, whether that public policy would
be jeopardized by terminating employees in like circumstances.  Fitzgerald v. Salsbury Chem.,
Inc., 613 N.W.2d 275, 282 (Iowa 2000).

**1. Clearly Defined Public Policy**

Iowa law limits the tort action for termination in violation of public policy "to cases
involving only a well recognized and clear public policy."  Id.  Limiting the cause of action in
such a manner "is necessary to overcome the employer's interest in operating its business in the
manner it sees fit."  Id.  Iowa courts rely on statutes, constitutions, and some administrative regu-
lations to determine public policy.  Jasper, 764 N.W.2d at 763-64.  Not all legislative enactments
support the tort, including those that "impose requirements whose fulfillment does not implicate
fundamental public policy concerns."  Id. at 765.  "[L]egislative pronouncements that are limited
in scope may not support a public policy beyond the specific scope of the statute."  Id. at 766.

The Iowa Supreme Court has stated that it "proceed[s] cautiously and will only extend . . .
recognition to those policies that are well recognized and clearly defined."  Davis v. Horton, 661
N.W.2d 533, 536 (Iowa 2003).

Mahony asserts that the clearly defined public policy in this case is "that it is illegal for
employers to fire employees for refusing to commit unlawful acts or to acquiesce in unlawful
schemes." Pl.'s Br. 14.  The Court agrees with Mahony as far as the statement goes.  The under-
lying statute Mahony relies on is 18 U.S.C. § 1001, which prohibits fraudulent statements to the
federal government.[8]  Mahony also cites various other federal statutes, all concerning fraudulent
conduct connected to federal health care programs.[9]  All of these statutes embody a clear public
policy not to commit fraud on the government; however, such a public policy is inapplicable in

---

[8] Mahony asserts that this Court is bound to recognize 18 U.S.C. § 1001 as a basis for this
tort under Smuck v. Nat'l Mgmt. Corp., 540 N.W.2d 669, 672-73 (Iowa Ct. App. 1995).  While
Smuck does recognize that federal law, and 18 U.S.C. § 1001 specifically, can serve as an
appropriate source for state public policy, this Court is not necessarily bound by such a ruling.
The Supreme Court of the United States has declared that federal district courts are bound by
state law as declared by the highest court of the state.  Comm'r v. Estate of Bosch, 387 U.S. 456,
464-65 (1967).  However, this Court is not bound by Iowa trial court decisions, and under some
conditions, Iowa intermediate appellate court decisions cannot bind federal authority.  Id. at 465.
"If the state's highest court has not clearly spoken, [federal courts] may rely on the decisions of
intermediate state courts, unless [federal courts] are convinced by persuasive data that the
highest state court would decide the issue differently."  Leonard v. Dorsey & Whitney, L.L.P.,
553 F.3d 609, 612 (8th Cir. 2009) (citing United Fire & Cas. Ins. Co. v. Garvey, 328 F.3d 411,
413 (8th Cir. 2003), and Bosch, 387 U.S. at 465).  Five years after Smuck, the Iowa Supreme
Court expressly refrained from ruling on the issue of whether federal law can support the tort of
termination in violation of public policy.  Fitzgerald, 613 N.W.2d at 285 n.4.  After recognizing
a clear split of authority in other states, the court noted that the "issue gives rise to a host of
considerations, including potential federal preemption issues."  Id.  Given the tension between
the declaration in Smuck and the later declaration in Fitzgerald, Smuck does not appear to be the
best evidence of what state law is.  Garvey, 328 F.3d at 413; Marvin Lumber & Cedar Co. v.
PPG Indus., Inc., 223 F.3d 873, 883 (8th Cir. 2000).  However, without predicting state law, for
purposes of summary judgment, this Court will proceed under the assumption that the Iowa
Supreme Court would recognize that federal law can serve as a basis for this tort.

[9] Mahony cites the following: 18 U.S.C. § 1035 (prohibiting fraudulent statements relating
to health care matters); 18 U.S.C. § 1347 (prohibiting fraudulent health care schemes); 42 U.S.C.
§ 1320a-7b (prohibiting Medicare and Medicaid fraud); and 42 U.S.C. § 1320a-7 (excluding
participation in Medicaid for certain criminal convictions).

this case.  As detailed above, the record does not reveal any unlawful act that Mahony refused to commit or an unlawful scheme to which Mahony refused to acquiesce.

The Court declines to extend recognition to any other public policies asserted by Mahony as they are not well recognized or clearly defined.  Mahony argues that public policy compels compliance with Medicare certification out of concern for critically ill children, young adult quadriplegics, and young adults with neuromuscular diseases.  If such were the case, then it would be illegal to open the Sheldon branch sans certification; nevertheless, Mahony acknowledges that there is nothing illegal about UPSI opening the Sheldon branch.  Mahony asks this Court to recognize a new basis for a cause of action for termination in violation of public policy because it would advance general social policies; however, "[a]ny effort to evaluate the public policy exception with generalized concepts of fairness and justice will result in an elimination of the at-will doctrine itself."  Fitzgerald, 613 N.W.2d at 283; see also Lloyd, 686 N.W.2d at 282-83 (refusing to recognize new public policy as grounds for wrongful termination tort where plaintiff's argument consisted of vague generalizations about the social desirability of upholding state criminal law without a clearly articulated legislative enactment).  UPSI terminated Mahony, but absent a clearly defined public policy, "it is not the role of this court to sit as a 'super-personnel department' to second guess the wisdom of a business's personnel decisions."  Ward v. Int'l Paper Co., 509 F.3d 457, 462 (8th Cir. 2007).

For these reasons, Mahony has failed to make a sufficient showing on an essential element of her termination in violation of public policy claim; therefore, UPSI is entitled to summary judgment.

### 2. Policy Undermined by Termination of Employee

Even assuming that a public policy was applicable in this case, Mahony cannot show that it would be undermined by her firing.  "Once a clear public policy is identified, the employee must further show the dismissal for engaging in the conduct jeopardizes or undermines the public policy."  Fitzgerald, 613 N.W.2d at 283-84.  The public policy is undermined when "the conduct engaged in not only furthered the public policy, but dismissal would have a chilling effect on the

public policy by discouraging the conduct." Id. at 284. "This element guarantees an employer's personnel management decisions will not be challenged unless the public policy is genuinely threatened." Id. Whether a public policy is undermined presents a question of law generally capable of resolution by a motion for summary judgment. Id. at 282.

Mahony's entire argument for this element is intertwined with her argument regarding the existence of a public policy and is premised upon UPSI engaging in illegal activity. Some confusion seems to exist regarding licensing versus certification in this case. Again, Mahony admits that there is nothing illegal about opening a home health care office. In other words, UPSI did not violate any licensing requirements by opening the Sheldon office. Mahony objected to opening the Sheldon office apparently because Form CMS-855A had not been completed, and the Sheldon office had not been separately certified by Medicare. Form CMS-855A is required for enrollment in order to bill Medicare for medical services. Failure to complete Form CMS-855A would only be relevant to an illegal act if a claim was actually submitted for payment. UPSI did not engage in illegal conduct; therefore, Mahony's actions cannot promote the claimed public policy, and her firing would not undermine any public policy. See id. at 285.

UPSI also argues that no public policy would be undermined because the law already provides sufficient incentive for home health care agencies to comply with the regulations, namely, if non-compliant, home health care agencies do not get paid. Mahony does not directly address whether public policy would be undermined by her firing except by citing Tuttle v. Keystone Nursing Care Center, Inc., No. 08-1002, 2009 WL 779538 (Iowa Ct. App. March 26, 2009) (unpublished), and then stating in rebuttal to UPSI[10] that "[t]here is no rational reason why

---

[10] Similar to its FCA argument, UPSI asserts that Mahony's claim fails because her job requirements are such that she cannot engage in activity protected by her claimed public policy. UPSI relies on Skare v. Extendicare Health Services, Inc., 515 F.3d 836 (8th Cir. 2008), wherein the Eighth Circuit concluded that the Minnesota whistleblower statute does not grant protection to an employee whose job duties require her to ensure regulatory compliance when that employee merely exercises her job duties by reporting compliance problems. Id. Since the Iowa Supreme Court has not addressed this particular issue, the Court reserves ruling on this particular argument due the lack of a clear statement of Iowa law.

conduct would be less chilled by allowing an employee's termination when the conduct happens to be job-related." Pl.'s Br. 24.  In <u>Tuttle</u>, the parties had agreed to the existence of a public policy, and the court found that there was a reasonable inference that the employee's firing would have a chilling effect on the parties' agreed-upon public policy by discouraging similar conduct.  <u>Tuttle</u>, 2009 WL 779538, at *7.  However, in <u>Tuttle</u> the employer had not properly challenged the existence of the public policy; therefore, the Iowa Court of Appeals could not rule on its validity.  <u>Id.</u> at *5.  Because in <u>Tuttle</u> the court was deciding the second element of the tort of termination in violation of public policy based upon an unrecognized public policy, <u>Tuttle</u> is unhelpful.

A court "must review [an employee's] conduct . . . to determine if it sufficiently matched the public policy."  <u>Fitzgerald</u>, 613 N.W.2d at 287.  Even if the Court were to recognize a new public policy in favor of protecting home health care agency clients through Medicare certification, Mahony's insistence that UPSI cease operations in Sheldon and become Medicare certified would not further that public policy.  UPSI's was already treating patients and was already certified by Medicare.  Mahony's conduct would not have changed UPSI's ability to treat patients out of its Carroll, Iowa, office nor improved the health care received by the potential Sheldon clients.  Mahony has not made a sufficient showing to satisfy the second element of this tort, and the Court finds as a matter of law that public policy is not undermined by Mahony's termination, especially in light of the financial incentives already inherent in the regulations at issue.

### E.  Promissory Estoppel

Mahony's final claim is based on promissory estoppel.  UPSI argues that Mahony cannot satisfy any of the elements of promissory estoppel nor can she show causation.  Mahony's counter argument is that she was fired despite a clear promise in UPSI's employee handbook and that her reasonableness is a question for a finder of fact.

The elements of a claim for promissory estoppel are

> (1) a clear and definite promise; (2) the promise was made with the promisor's
> clear understanding that the promisee was seeking an assurance upon which the

> promisee could rely and without which he would not act; (3) the promisee acted
> to his substantial detriment in reasonable reliance on the promise; and
> (4) injustice can be avoided only by enforcement of the promise.

Schoff v. Combined Ins. Co. of Am., 604 N.W.2d 43, 49 (Iowa 1999). "The burden of proof is

on the plaintiff to prove an estoppel," and "strict proof of all elements is required." Id. at 50.

The Court will address the parties' arguments in turn.

### 1. Clear and Definite Promise

Mahony argues that UPSI's employee handbook expresses a clear and definite promise not

to retaliate against an employee who avails herself of the grievance procedure.[11]  UPSI asserts

that the handbook did not create a promise, rather the statements contained therein are mere

representations, and even those representations were expressly disclaimed in the handbook.

In this context, the employee must show that the employer made a clear and definite

promise to support a promissory estoppel claim.  Id.  "A 'promise' is '[a] declaration . . . to do or

forbear a certain specific act.'"  Id. at 50-51 (quoting Black's Law Dictionary 1213 (6th ed.

1990)).  "A promise is 'clear' when it is easily understood and not ambiguous" and "'definite'

when the assertion is explicit and without any doubt or tentativeness."  Id. at 51 (citing

---

[11] UPSI's handbook sections Mahony relies upon are as follows:

§ 903:1 Grievance Procedure
Policy: It is the policy of Ultimate to abide by the grievance procedures to ensure a
fair and effective means of resolving work-related complaints and problems.
Comments:
. . .
4.  Ultimate will not permit any supervisor, manager, or employee to engage in
any form of retaliation against any employee availing him/herself of the
grievance procedures.

§ 1005:1 Appendix E: Grievance Procedure
Any person who believes he or she has a valid complaint/grievance may file a
grievance under this procedure.  It is against the law for the Company, [sic] to
retaliate against anyone who files a grievance or cooperates in the investigation
of a grievance.

Defs.' App. 55-56.

<u>Webster's Third New International Dictionary</u> 419 (unab. ed. 1993)).  A representation is made to convey a particular view or impression of something and, even if intended to influence action, is not a promise.  <u>See</u> <u>id.</u> (distinguishing a promise from a representation and declaring that a representation is "a statement . . . made to convey a particular view or impression of something with the intention of influencing opinion or action").

Taken alone, the statement in the handbook that "[UPSI] will not permit any supervisor, manager, or employee to engage in any form of retaliation against any employee availing him/ herself of the grievance procedures" is an easily understood, unambiguous, and explicit declaration without doubt or tentativeness to forbear from retaliation.  The language of this declaration does not lend itself to the interpretation that it is merely a representation rather than a promise. Thus, as Mahony asserts, the Court finds that UPSI made a clear promise not to retaliate against employees who file grievances.

UPSI, however, argues that the anti-retaliation declarations cannot be taken alone, and the handbook should be read as a whole, including statements disclaiming any promises made in the handbook.[12]  It should be noted that under Iowa law, "the employment-at-will relationship does

---

[12] The relevant disclaimers state as follows:

§ 103:1 Functions of this Manual
Policy: It is the policy of Ultimate that this Manual should be used as an outline of the basic personnel policies, practices, and procedures for the organization.  The Manual is not intended to alter the employment-at-will relationship in any way.
Comments:
1.  This Manual contains general statements regarding Ultimate policies and should not be read as including all of the details of each policy.  In addition, this Manual should not be interpreted as forming an express or implied contract or promise that the policies discussed in it will be applied in all cases.  Ultimate may add to the policies in the Manual or revoke or modify them at any time.  Ultimate will try to keep the Manual current but there may be times when the policy will change before this material can be revised.

§ 106:1 Code of Employer - Employee Relations
Policy: It is the policy of Ultimate to implement effective personnel policies and to require all employees to support the organization's best interests.
Comments:
. . .

not bar recovery under a theory of promissory estoppel." <u>Schoff</u>, 604 N.W.2d at 50.  Each of the disclaimers in the handbook appears in the context of attempts to maintain the at-will status of employees, perhaps in recognition that Iowa law allows an employee handbook to modify at-will employment relationships.  <u>Alderson v. Rockwell Int'l Corp.</u>, 561 N.W.2d 34, 36 (Iowa 1997) (stating that there is an exception to at-will employment when implied contract is created by a handbook "suggesting that discharge will occur only under certain circumstances").  Stating the holding of <u>Alderson</u> another way, Iowa law recognizes that at-will employment may be modified if an employee handbook suggests that discharge will not occur under certain circumstances, in this case in retaliation for filing a grievance.  UPSI does not present any Iowa law that compels this Court to disregard the promise not to retaliate because the promise was disclaimed.  In fact, UPSI does not cite any law regarding disclaimers relating to this element of a promissory estoppel claim.  Indeed, the law regarding disclaimers generally focuses on the reliance element.

However, a promise must not only be clear, it must also be definite.  <u>Schoff</u>, 604 N.W.2d at 49.  Since the same handbook that made the promise in this case also disclaims any promises, the Court expresses diffidence that the promise not to retaliate is definite.  With a disclaimer in a handbook as broad as the one at issue in this case, at the very least, some doubt or tentativeness must be attached to any supposed promises made by the handbook.  Ultimately, however, the assertion alone is expressed without any doubt or tentativeness, and thus the Court will consider, without holding, the assertion as a promise in analyzing this motion.[13]

---

3.  Employment is on an at-will basis, so that either Ultimate or the employee may end the relationship at any time and without cause or prior notice.  Nothing in this manual changes the employment-at-will relationship or creates an expressed or implied contract or promise concerning Ultimate's policies or practices, including policies or practices it will implement in the future.  Accordingly, Ultimate retains the right to establish, change, and abolish its policies, practices, rules, and regulations at will and as it sees fit.

Defs.' App. 66, 70.

[13] Given the remainder of the Court's consideration, the Court concludes it need not attempt to resolve or certify a question on what appears to be an unsettled area of Iowa law on the power of disclaimers.

### 2. Promisor's Understanding that Promisee was Seeking Assurances

UPSI argues that Mahony cannot satisfy the second element of a promissory estoppel claim because she did not talk to anyone at UPSI about the grievance procedure prior to filing her grievance.  Mahony counters by citing a Vermont case for the proposition that an employee can seek assurances from the handbook itself.

To establish the second element of promissory estoppel, a plaintiff must show that "the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he would not act."  Schoff, 604 N.W.2d at 49.  "This dual emphasis on clarity and inducement parallels the Restatement (Second) definition of an agreement for purposes of promissory estoppel as '[a] promise which the promisor should reasonably expect to induce action . . . on the part of the promisee.'"  Nat'l Bank of Waterloo v. Moeller, 434 N.W.2d 887, 889 (Iowa 1989).

At Mahony's deposition she admitted that she never sought any assurances by speaking to anyone at UPSI prior to filing her grievance.  Her admission would normally preclude her from satisfying this element; however, Mahony argues that she can seek assurances from the handbook itself.  Mahony relies on a Vermont promissory estoppel case, Foote v. Simmonds Precision Prods. Co., Inc., 613 A.2d 1277 (Vt. 1992).  The facts and law in Foote are distinguishable from this case.  In Foote, the employee was discharged after twenty years of service, with an excellent work history.  Foote, 613 A.2d at 1278.  Prior to his termination, the employee became concerned about a supervisor whom the employee felt was unqualified, and about changes in pay and benefits.  Id.  The employee wanted to address his concerns through the employer's grievance procedure but was concerned about losing his job.  Id.  The employee consulted with human resources, who referred him to the grievance procedure in the employee handbook.  Id.  The employee handbook contained language that indicated employees could not be penalized for pursuing a grievance, and the employee's personnel manager testified that the company intended that employees would rely on the handbook.  Id.  When the employee attempted to follow the procedure, he was evaluated poorly and was discharged three months

later.  Id.  The employer claimed that it fired the employee for falsifying his time card.  Id.  The jury found that the employee was fired as a result of filing a grievance, and the Supreme Court of Vermont affirmed the jury's determination, finding that there was sufficient evidence on each element necessary for promissory estoppel.  Foote, 613 A.2d at 1281.

In this case, Mahony was fired after a tenure during which she was praised by UPSI for her contributions to the company.  She became concerned that UPSI was not following Medicaid regulations and sought to address her concerns by filing a grievance in accordance with hand-book procedures; however, Mahony never spoke with UPSI human resources prior to filing her grievance nor was she referred to the handbook grievance procedure after expressing concern about UPSI's regulatory compliance.  Additionally, Iowa promissory estoppel law is different than Vermont law applied in Foote.  The law regarding assurances in Foote was passive, only looking at the promisor's *ex ante* expectations regarding the promise.[14]  Iowa law, however, requires more.  As stated in Schoff, the promise must be made with the "clear understanding that the promisee was *seeking* an assurance."  Schoff, 604 N.W.2d at 49 (emphasis added).  The Court reads this statement of Iowa law to require that the promisee actively seek assurances on a promise before acting on the assurance.  Mahony has presented no evidence that UPSI made the promise in the handbook with the clear understanding that Mahony was actively seeking assurances, without which she would not have filed the grievance.  Nor has Mahony presented evidence that she knew of the promise in the handbook and actively sought assurances from UPSI before filing her grievance.

Because Mahony admits that she never spoke with UPSI prior to filing her grievance, UPSI could not have had an understanding that Mahony would not have acted but for the promise not to retaliate found in the handbook.  Therefore, no genuine issue of material fact

---

[14] The law of promissory estoppel applied in Foote was taken from the Restatement (Second) of Contracts § 90(1) (1981) and reads in part, "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person."

exists, and Mahony has failed to establish an essential element of promissory estoppel, rendering summary judgment appropriate.  Schuhardt, 390 F.3d at 566.

### 3. Detrimental Reliance

Due to the express disclaimer in the handbook, UPSI argues that Mahony cannot have reasonably relied on any representations therein, and she suffered no detriment since she did not quit her job.  Mahony argues that she filed her grievance trusting that she would not be fired for doing so, yet she was still terminated four days later.

Promissory estoppel requires that "the promisee acted to his substantial detriment in reasonable reliance on the promise."  Schoff, 604 N.W.2d at 49.  To generate a genuine issue of fact, detrimental reliance should be based on "foreseeable, reasonable, substantial, and prejudicial reliance" on the promise.  Matter of Graham's Estate, 295 N.W.2d 414, 419 (Iowa 1980).  Detrimental reliance is defined as "[r]eliance by one party on the acts or representations of another, causing the worsening of the first party's position."  Black's Law Dictionary 1404 (9th ed. 2009).

UPSI relies on this Court's decision in Delaria v. American General Finance, Inc., 998 F. Supp. 1050 (S.D. Iowa 1998), for the proposition that an express disclaimer negates the existence of an implied contract.[15]  Delaria was a breach of contract case in which this court held that an express disclaimer would not allow the formation of an employment contract.  Id. at 1064.  Delaria relied on Iowa law as expressed in Anderson v. Douglas & Lomason Co., 540 N.W.2d 277, 287 (Iowa 1995).  Delaria, 998 F. Supp. at 1064-65.  In Anderson, the court considered the effect of handbook disclaimers.  Anderson, 540 N.W.2d at 287-89.  The Anderson court stated,

---

[15] UPSI also cites the following: Friedman v. BRW, Inc., 40 F.3d 293, 297 (8th Cir. 1994) (employee cannot rely on employer's promise when handbook expressly states employment is at will); and Worley v. Wyo. Bottling Co., Inc., 1 P.3d 615, 624 (Wyo. 2000) ("Disclaimer provisions are enforceable against promissory estoppel claims.").

> A disclaimer should be considered in the same manner as any other language in the handbook to ascertain its impact on our search for the employer's intent . . . [by] simply examin[ing] the language and context of the disclaimer to decide whether a reasonable employee, reading the disclaimer, would understand it to mean that the employer has not assented to be bound by the handbook's provisions.

Id. at 288. Such an examination is guided by two factors: "First, is the disclaimer clear in its terms: does the disclaimer state that the handbook does not create any rights, or does not alter the at-will employment status? Second, is the coverage of the disclaimer unambiguous: what is the scope of its applicability?" Id. In this case, the disclaimers expressly deny that the handbook forms any promise by UPSI. In analyzing the scope of the disclaimer, Anderson determined that the location of the disclaimer and the language used did not suggest that the disclaimer would not apply to the handbook's discipline policies. Id. The court further found that "[t]he disclaimer is found in the handbook itself" and held that "a reasonable person reading the handbook could not believe that [the employer] has assented to be bound to the provisions contained in the manual." Id. at 288-89. Although Anderson considered whether the handbook as a whole was an offer of employment giving rise to contract rights at odds with at-will employment and did not discuss disclaimers in the context of promissory estoppel, it is instructive to the case at bar. Promissory estoppel is an equitable remedy not based on contract law making the contract theories relied on in Anderson not precisely on point. Rather, promissory estoppel is a substitute for contract law in cases where no contract has been formed for lack of consideration, detrimental reliance substituting for consideration. Schoff, 604 N.W.2d at 49. Still, Schoff noted that it found little to distinguish promissory estoppel from a unilateral contract claim. Id.

Reading Schoff together with the analysis in Anderson, the Iowa Supreme Court would probably not find that a reasonable person would believe that UPSI assented to be bound by the grievance procedures in the manual. Mahony nevertheless asserts that UPSI should be bound by

its promise not to retaliate, disclaimers notwithstanding.  Mahony argues that her claim is based upon the illegality of retaliation.  Mahony reasons that UPSI's handbook states that discharge can be for any reason not prohibited by law and that since UPSI's promise to not retaliate is premised on the notion that retaliation is illegal, her promissory estoppel retaliation claim is not governed by the handbook or its disclaimers.  Mahony's argument is severely undermined because the Court is granting summary judgment against her on counts one and two of her complaint, essentially ruling that her termination was *not* prohibited by law.

Mahony argues that even when a disclaimer is present, the reliance element is a question for the jury.  Barske v. Rockwell Int'l Corp., 514 N.W.2d 917, 925 (Iowa 1994).  In Barske, the employees alleged that the company represented to potential employees that the period of employment would be five years but laid off all employees after two years.  Id. at 919.  On appeal, the employees argued that a disclaimer in an employment application that stated employment was for an indefinite term did not bar their tort claims.  Id. at 920.  The jury had been instructed on the disclaimer defense and was able to consider the effect of the disclaimer on the reliance element.  Id. at 925.  The court ruled that under such circumstances, the employees' misrepresentation claims had been properly submitted to the jury.  Id.  While Barske shows that it is not improper to submit a disclaimer defense to the jury, it does not mandate that such a question is reserved exclusively for the fact finder.  Additionally, it is significant that the disclaimer in Barkse was separate from the alleged promise, while in this case the alleged promise is found in the same document as the disclaimer.  Regardless, the Court finds that Anderson provides strong support for the Court to conclude that no reasonable person would have relied on representations found in a handbook that were disclaimed in the very same handbook.  Anderson, 540 N.W.2d at 288-89.

**III.   CONCLUSION**

For the reasons stated herein, the Court finds that Mahony's FCA and public policy retalia-tion claims fail as a matter of law, and no genuine issue of material fact exists regarding promissory estoppel.   Accordingly, Defendants' Motion for Summary Judgment (Clerk's No. 29) must be **granted**.   The above-captioned action is **dismissed**.

**IT IS SO ORDERED.**

Dated this 14th day of January, 2010.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT